**EPLUS GROUP, INC., Plaintiff–Appellant,**

v.

**TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA,[1] Defendant–Appellee,**

1. Travelers Insurance Company was sued in error. We direct the Clerk of Court to change

**Banc of America Leasing and Capital, LLC. and Gmac Commercial Finance, LLC., Defendants.**

No. 06–5222–cv.

United States Court of Appeals, Second Circuit.

March 11, 2008.

this case's Official Caption accordingly.

Stephen W. Greiner (Kristin Branson, on the brief), Willkie Farr & Gallagher LLP, New York, N.Y. and Michael E. Geltner, Geltner & Associates, P.C., Washington, D.C., for Plaintiff–Appellant.

Stephen M. Lazare (Andrew Premisler, on the brief), Lazare Potter Giacovas & Kranjac, LLP., New York, N.Y., for Defendant–Appellee.

2. The Honorable Brian M. Cogan, United States District Court for the Eastern District of New York, sitting by designation.

3. The distinction between Banc of America Leasing & Capital, LLC and Banc of America Vendor Finance, Inc. is immaterial for present purposes. For convenience, we use "BoA" to refer to both.

4. The parties contest both who provided the equipment to Cyberco (Teleservices or ePlus), and who paid Teleservices (the Banks or ePlus). And, to complicate matters further, Teleservices was, according to ePlus, merely the alter ego of Cyberco. Travelers says that "ePlus borrowed the funds to acquire computer equipment ... from Teleservices ... which equipment ePlus was to then lease to Cyberco...." Appellee's Br. at 8. But ePlus contends that "[t]he actual sale and purchase

Present: Hon. RALPH K. WINTER, Hon. RICHARD C. WESLEY, Circuit Judges, and Hon. BRIAN M. COGAN, District Judge.[2]

## SUMMARY ORDER

Familiarity by the parties is assumed as to the facts, the procedural context, and the issues on appeal.

In March 2004, ePlus reached an agreement with Cyberco Holdings, Inc. ("Cyberco") in which ePlus would acquire financing for computer equipment that ePlus would then make available to Cyberco through either an installment sale or a secured financing, according to the conflicting accounts of the parties. ePlus successfully secured financing from GMAC Commercial Finance LLC ("GMAC") and Banc of America Vendor Finance, Inc. (which later became Banc of America Leasing & Capital, LLC[3]). GMAC and BoA (the "Banks"), in turn, provided the financing, either directly to Teleservices Group, Inc. ("Teleservices"), or via ePlus, to pay for the transfer of the servers to Cyberco.[4]

of the servers was accomplished among Teleservices, Cyberco, and the Banks with virtually no further involvement from ePlus. GMAC and BoA wired the payment for the servers to Teleservices, and the servers were delivered directly to Cyberco from Teleservices." Appellant's Br. at 8. See also Decl. of George Fox, in J.A. at 401 ("[T]he lenders wired the cost of acquisition of the servers to Teleservices."); id. at 402 ("On each occasion, GMAC wired the funds for acquisition to Teleservices."). The exact nature of these transactions, and the degree to which ePlus's involvement in them may have "triggered" one of the insurance policy's exclusion provisions is a factual issue we see no need to resolve. Since we affirm the district court's opinion on different grounds—i.e., the absence of any "occurrence" that would have entitled ePlus to coverage—the possible application of the exclusions is immaterial.

In three GMAC agreements consummated between March and October 2004, ePlus warrantied, *inter alia*, that it: (1) had fully paid for the computer equipment; (2) had clear title to that equipment; and (3) "own[ed] and [wa]s assigning all of its rights, title, and interest in, to, and under the Agreement and the other Collateral to the Lender, free and clear of any liens, claims and encumbrances."[5] *Eplus Group, Inc. v. Banc of Am. Leasing and Capital, LLC,* 2006 WL 318863, *2 (S.D.N.Y.2006) (quotation marks omitted). According to Travelers, the agreements also provided that the computer equipment would serve as collateral for GMAC's loans to ePlus, providing GMAC with a security interest in the equipment.

In a separate agreement with BoA for the financing of other equipment, ePlus warrantied that: (1) it had title to the equipment; and (2) the equipment either (a) if it was new, was "as described in the Contract, invoice and purchase order," or (b) if it was used, "conform[ed] to applicable specifications and all warranties, whether express or implied; [and] ... [was] as described in the Contract, invoice and purchase order...." *See id.* at *2 (quotation marks omitted; first alteration in original). Travelers claims that as a result of this agreement, like the GMAC agreement, BoA received a security interest in the equipment.

Ultimately, following an alleged fraud by Cyberco and Teleservices, the loans went into default. After Travelers denied ePlus

coverage under its insurance policy, ePlus sued GMAC, BoA, and Travelers, seeking a declaratory judgment that ePlus was not liable to the Banks or, in the alternative, coverage under the Travelers policy. GMAC and BoA sued ePlus in state courts in New York[6] and Virginia, respectively. Meanwhile, Travelers and ePlus both moved for summary judgment. The disposition of those motions led to the instant appeal.

From July 2003 to July 2004, ePlus was insured under a commercial general liability ("CGL") insurance policy provided by Travelers.[7] Under the terms of the policy, ePlus was "covered"—*i.e.*, entitled to defense and indemnification—for "bodily injury" or " 'property damage' ... caused by an 'occurrence.' " The policy defined an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

Even if covered, however, ePlus would not be entitled to defense and indemnification by Travelers if certain "exclusions" applied. For instance, ePlus would not be entitled to coverage if the "property damage" was to: (1) property that ePlus "own[ed], rent[ed], or occup[ied]," *id.* at *2 (quotations omitted), or (2) " '[ePlus'] product' arising out of it or any part of it," *id.* (quotations omitted; alteration in original). The policy defined "product" to include "goods or products ... sold, handled, distributed or disposed of by" ePlus, as well as "[w]arranties or representations made

---

**5.** ePlus evidently made these warranties—as well as those conveyed to BoA, discussed below—without having satisfactorily inspected the equipment.

**6.** The GMAC suit has since been removed to federal district court in the Southern District of New York.

**7.** During the same time period, ePlus had a supplemental Excess Liability Insurance Poli-

cy from Travelers. In addition, ePlus had another Commercial General Liability Insurance Policy during the 2004 to 2005 period, and a companion Excess Liability Insurance Policy. Any differences among the policies are irrelevant to this appeal and for convenience, we refer simply to a single insurance agreement.

**120**

at any time with respect to fitness, quality, durability, performance or use of [such] product." *Id.* (quotation marks omitted; first alteration in original).

In its decision and order below, the district court concluded that ePlus was not "covered" under the terms of its insurance agreement with Travelers, *id.* at *4, or, in the alternative, that ePlus was not entitled to coverage due to the "likely" application of relevant "exclusions," *id.* at *4–5. Because we agree that there was no occurrence, we affirm on that basis.

New York courts have adopted the principle that "[t]he purpose and intent of [a general liability] insurance policy is to protect the insured from liability for essentially accidental injury to the person or property of *another* rather than coverage for disputes between parties to a contractual undertaking." *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Pep Boys—Manny, Moe & Jack,* 304 A.D.2d 218, 759 N.Y.S.2d 42, 45 (N.Y.App.Div.2003) (quoting *Redevelopment Auth. of Cambria County v. Int'l Ins. Co.,* 454 Pa.Super. 374, 685 A.2d 581, 589 (1996)) (quotation marks omitted; alterations in original; emphasis added). But the injury or liability for which ePlus now seeks indemnification was to itself, rather than to another. That is to say ePlus's own acts or omissions precipitated the contract claims brought by the Banks against ePlus. ePlus was uniquely positioned to prevent its own liability—it could have done so by simply undertaking a proper inspection of the servers in support of its warranties.

It is not enough to claim, as ePlus does here, that Cyberco's fraud was unintended by ePlus, and therefore "accidental." This clearly misses the point. An occurrence is an unintended event—an accident—that causes injury to *another* person or their property, for which the insured is held liable. Here, ePlus was clearly negligent—it failed to discover that the computer servers that were collateral for its debt were junk. The injury was not to another; it was to ePlus, for its own negligence caused it to breach its warranties to the Banks. To grant ePlus coverage under these circumstances would be to convert the CGL policy to a loan guarantee. This, we cannot do.

For these reasons, we **AFFIRM** the judgment of the district court.